Charles T. Major, J.
The above-entitled and numbered claims were filed to recover damages caused by the alleged negligence of the defendants.
One of the claimants, Douglas Gray, became 21 years of age since the filing of his claim and accepted a settlement for damages from the driver of the other vehicle involved, without reservation against the State. It was agreed that his portion of the claim be discontinued.
Notices of intention to file the claims were filed with the Clerk of the Court of Claims and the Department of Law on April 1, 1957. The claims were duly filed on December 30, 1958, and have not been assigned or submitted to any other court or tribunal for adjudication.
Limited letters of administration in the estate of Mary Lou Gray were duly granted to Anthony Squadrito by the Onondaga County Surrogate on February 14, 1957.
On December 31, 1956, at approximately 12:45 a.m., Douglas Gray was driving a 1949 Pontiac two-door automobile owned by his sister, Geraldine Squadrito, in a westerly direction on Seventh North Street towards its intersection with State Highway No. 54-3 in the County of Onondaga. Geraldine Squadrito was sitting in the middle of the front seat next to the driver, and Mary Lou Gray, their mother, was a passenger occupying the portion of the front seat next to the right door of the vehicle. Simultaneously, Clinton W. Paddock was alone, driving his 1951 Packard automobile southerly in the southbound lane of State Highway 54-3 towards its intersection with Seventh North Street. The two cars collided under the traffic light in the center of Seventh North Street and the southbound lane of State Highway No. 54-3. As a result of the collision, Mary Lou Gray died *760 at 3:05 a.m., and Geraldine Squadrito sustained personal injuries and her car was damaged.
Seventh North Street, as it approaches this- intersection, is a 27-foot wide two-lane county highway running in an easterly and westerly direction. State Highway No. 54-3 is a concrete divided State highway with lanes 24 feet wide on each side of a 20-foot mall. Traffic on the easterly lane runs northerly, and the westerly lane carries southbound traffic.
Traffic at this intersection was controlled by three traffic controls— one at the intersection of Seventh North Street and the northbound lane of the State highway controlled the westbound traffic on Seventh North Street and the northbound traffic on the State highway; the second controlled the southbound traffic on the westerly lane of the State highway, with a light for traffic from the Thruway exit; and the third controlled the eastbound traffic on Seventh North Street. The traffic signals which controlled Seventh North Street traffic had three signal heads, red at top, yellow in the center, and green below. In addition, there were green arrows beneath the green light on the traffic signals which controlled the west- and eastbound traffic on Seventh North Street. There were no caution or amber lights on the traffic controls facing the north and southbound traffic on the State highway. Each of these traffic controls were about 14% feet above the pavement.
The lights in these traffic signals were controlled and timed by a full vehicle actuated signal, which was controlled by the approaching traffic by means of detectors on each approach. The detectors on the State highway were 170 feet from the traffic lights in both directions, and 145 feet east and west on Seventh North Street. The approaching traffic determined the various phases. The signal for traffic on State Highway No. 54-3 had a combination initial and vehicle interval of 13 seconds and a maximum of 25 seconds. This could extend to any number of seconds if there was no traffic moving on the other approaches. On Seventh North Street, there was a combination of 13 seconds for initial vehicle with a 30-second maximum setup. The yellow or amber interval was 4 seconds in each case. If no traffic was proceeding in either direction, the signal would remain green on the State highway and red on the other approaches. This would be constant until the next vehicle in a right-angle direction would pass the detectors and actuate the light.
The signal head facing east on Seventh North Street would be the only face visible to the operator of an approaching car from the east. Likewise, the signal facing north on the westerly lane of the State highway would be the only one visible to motorists going south.
*761 Detectors are magnetic fields under the pavement and as the front end of a car hits this magnetic field, it would be like pressing a button and actuating changes would be set in motion. The way the signals were set up, it was not possible for a motorist traveling west on Seventh North Street and one going south on the State highway to have a green light at the same time.
The speed limit on the State highway was 50 miles per hour, and on Seventh North Street 35 miles per hour. However, the speed limits at this intersection from both approaches was 20 miles per hour. (Vehicle and Traffic Law, § 56.) Prior to the installation of these traffic controls, extensive studies were made by the Senior Engineer of the Traffic Engineering Department of the State Department of Public Works. Thereafter, the design was approved by the District Design Department. These controls were then approved by the District Engineer, Chief Engineer, Federal Engineer and Federal Bureau of Roads, because the Federal Government participated in 50% of the costs, and was finally approved by the State Traffic Commission. These controls were put in service on or about June 3,1955, and continued in service through and beyond the date of the accident. According to the testimony of the State Senior Engineer, these traffic lights changed from 1,600,000 up to 2,000,000 times during this period.
A count of the traffic moving on Seventh North Street just east of the State Highway No. 54-3, during a 24-hour period showed a daily average of 8,001 cars for seven days from September 7 to 13, 1956. The count taken just south of the intersection for the northbound traffic between August 29 and September 4, 1956 showed an average of 8,235 vehicles per day for traffic flowing south across this intersection. The average for the week from September 3 to September 9, 1956 was 7,995.
Douglas Gray testified that immediately prior to the accident, he was driving his sister’s car westerly on the right side of Seventh North Street at about 20 miles per hour. He first observed the green light on the traffic signal when he was several hundred feet away, and continued to observe the green light until he was about to enter into the intersection when the light went out of his vision because of the roof of the car he was driving. As the front of the automobile went into the State highway, he saw that the traffic signal light turned yellow by the reflection on the hood of his oar. He proceeded through the intersection when he observed an automobile coming from his right and proceeding southerly on the State highway. He claimed that his car was three or four feet from the southbound lane when he made this observation, and at that párticular time the approaching automobile was 50 to 75 feet away traveling approximately *762 40 to 50 miles per hour. He applied his brakes and started to turn to the left to go sonth on the State highway. The two ears collided directly under the traffic light in the southbound lane.
Clinton W. Paddock, owner and operator of the other car involved in the collision, testified that immediately before the accident he was traveling southerly on the east side of the southbound lane of the State highway, and when he was about to enter the intersection the color of the traffic light was green. He stated that the traffic light facing him was green for a distance of between 100 to 200 feet north of the traffic light. He was driving about 35 miles per hour. He stated that as he came into the intersection he saw lights coming from his left, and this was the first time that he had seen the lights. At this time the front end of his car was just under the light in the intersection. He maintained that the car approaching from the left hit him after he had passed the intersection. As a result, Paddock’s car rolled over three or four times and came to rest upside down in the field.
Seventh North Street and the State highway are practically level as they approach this intersection. At the time of the accident, it was snowing and there was quite a lot of snow on the highway. This was a general condition in the area.
There are no obstructions at this intersection and both drivers had a clear view for several hundred feet in all directions. If they were alert, as they should have been, each driver would have seen the lights of the other approaching car, and could have prevented this accident.
The claim of Anthony Squadrito as administrator of the estate of Mary Lou Gray, deceased, against Clinton W. Paddock was settled by his insurance company for the sum of $10,000. Claimants Geraldine Squadrito and Anthony Squadrito received $4,500 from Mr. Paddock’s insurance company. In both instances, claimants reserved their rights to proceed with their respective claims against the State.
Prom the evidence presented, it appears that claimants herein base their allegation of negligence upon the State’s failure to provide safe and appropriate traffic lights at this intersection. They failed to produce any credible evidence to show that the traffic lights were not working properly, or that there was anything wrong with them. No prior accidents at this busy intersection were proven.
The traffic signals at this intersection were designed and installed after extensive studies of the traffic conditions thereat. They were duly approved as hereinbefore stated, tested from time to time, and found working properly. The determination of the State Traffic Commission herein is within the scope of the case of Weiss v. Fote (7 N Y 2d 579).
*763 Upon motion of the State, both claims against the New York 1 State Thruway Authority were dismissed.
The claimants have failed to prove any negligence or want of care on the part of the State which was the proximate cause of this accident and resulting damages, or in any way contributed thereto. These claims must be and hereby are dismissed.